**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>YMER SHAHINI, *et al.*,<br><br>        Defendant. | Case No. 15 CR 643<br><br><br>**SENTENCING MEMORANDUM (YMER SHAHINI)**<br><br><br>Date:    December 3<br>Time:   12:00 p.m.<br>Judge:  Honorable Paul K. Castel |

## I.   INTRODUCTION

Ymer Shahini deeply regrets his role in the instant offense and offers no excuses for his conduct. He hereby moves for a variance from the agreed-upon guideline range (57 to 60 months) based on multiple factors. He respectfully submits that his offense represents an aberration in the life of an otherwise good and generous man and further submits that a sentence of five months would more than adequately protect the public. Specifically, he requests that this Court should vary downward based on:

1. His role in rescuing his extended family from the genocide in Kosovo.
2. His role in taking care of his elderly parents and, in particular, his mother.
3. His estrangement from his children, his wife, and parents during his incarceration in a foreign country which his family cannot visit for financial and health-related reasons.
4. His loss of employment for almost four years after indictment and before extradition.
5. His incarceration in solitary confinement in a maximum-security facility in Kosovo for 73 days.
6. His waiver of litigation of extradition issues in Kosovo.

Moreover, under 18 U.S.C. Section 3553 (a)(6), this Court should vary downward to the 150-day sentence imposed on Jared Galanis whose culpability *far exceeded* that of Mr. Shahini. This Court

-1-

**YMER SHAHINI'S SENTENCING MEMORANDUM**

should impose the same sentence, or lower, on Mr. Shahini in order to avoid the potential for a profoundly unwarranted and unjust disparity given the profound differences in culpability between Mr. Shahini and Jared Galanis, a member of the Bar who directed Mr. Shahini at the direction of others. *Putting everything else aside, this Court should not sentence a man who received directions to more time than the sentence imposed on the man who gave him those directions.*

## II.     FACTUAL BACKGROUND[1]

A.  <u>Ymer Shahini's Life in Canada</u>

In 1994, Mr. Shahini immigrated to Canada with his wife, Sofia, and two children. They settled in British Columbia where he established a very successful company (StartSoft Design) which contracted with IBM Canada for projects done on behalf of the government. During this period (1995 to 2000), Mr. Shahini had an income of approximately $125,000 per year which allowed him to save funds which he would later devote, in great part, to rescuing his extended family from war and genocide.

B.  <u>Mr. Shahini's Role in Rescuing His Extended Family</u>

Mr. Shahini's role in saving his family is reflected in the numerous letters attached hereto from his extended family members as Exhibits A to N. In essence, he single-handedly arranged for, and financed, the emigration of 67 members of his extended family from Kosovo to Canada. He did so because he and his family are ethnic Albanians subject to Serbia's genocide during the war in Kosovo (1994-1999). He sponsored them, arranged for their travel, and supported them emotionally. His selflessness during this period does not excuse the instant crime but might give the Court a sense of the best aspects of the man and his potential for redemption.

---

[1] Mr. Shahini does not anticipate having any factual objections. However, he has not yet received the final Pre-Sentence Report to which he made limited objections.

When the Peace Accord was signed in June 1999, and Serbia withdrew his forces from Kosovo, Mr. Shahini's parents decided to return to their home in Kosovo against the wishes of Mr. Shahini and the family. Mr. Shahini's brother,[2] and the rest of the extended family, decided to stay in Canada and, therefore, Mr. Shahini was compelled, despite being settled in Canada, to return to Kosovo with his parents who were returning to a demolished house in country devastated by war. Mr. Shahini travelled back to Kosovo first, restored the home, and his parents and wife and children followed in early 2000.

C.  <u>Mr. Shahini's Friendship with Derek Galanis</u>

In Kosovo, Mr. Shahini was recruited by the International Project Consulting Company to serve as a software expert for their operations in the Albania, Bosnia, and Kosovo. Mr. Shahini was responsible for designing, building, and implementing systems for the first bank established in post-war Kosovo (MEB now ProCredit Bank which, until 2003, was the only bank licensed by the UN mission).

Unfortunately, it is through the work described above that Mr. Shahini met Derek Galanis who told Mr. Shahini that he intended to open an AIG affiliate in Kosovo to sell third party liability insurance under a UN license. Derek Galanis asked Mr. Shahini to join his team as COO and build a system for AIG. Mr. Shahini did not accept immediately but, instead, agreed to create the system and manage implementation. Mr. Shahini eventually joined AIG Kosovo in mid-2000. AIG Kosovo generated over one million dollars in revenue and profit.

During this time, Mr. Shahini and Mr. Galanis became friends and Mr. Shahini met the Galanis family in late 2000 on a stopover in New York during a trip to visit his own family in Canada. Between 2005-2009, Mr. Shahini visited Derek and his parents in San Francisco on several occasions (as side

---

[2] Mr. Shahini's brother has since passed away.

-3-

**YMER SHAHINI'S SENTENCING MEMORANDUM**

trips paid for by the Galanises whenever he traveled to Canada to see his own family). The Galanises treated Mr. Shahini like a son and, during this period, Mr. Shahini met Jared Galanis and was told that Jared was a respected business lawyer. No one discussed with Mr. Shahini the convictions and fraudulent past that Jason and John Galanis had. On the contrary, they portrayed themselves as very successful investors and businesspeople and their possessions (lavish homes, for example) and lifestyle appeared to confirm this story. The Galanises would also often speak of setting up a trust fund for the education of Mr. Shahini's children so that they could attend Berkeley or UCLA.

During one visit, John and Jason proposed a "white energy" project related to lignite because Kosovo has the largest lignite reserves in the world. The Galanises suggested that they would create an investment company to raise funding from the Albanian diaspora to invest in "white energy." Mr. Shahini was assigned to develop a business plan and invested significant time to this project. At this time, the Galanises also proposed helping Mr. Shahini to start a financial services project for remittances to Kosovo.

D.  Mr. Shahini's Involvement in Gerova

Mr. Shahini first heard about Gerova in May 2010. At this time, Derek Galanis did not yet know that Gerova was a fraud and therefore could not have and did not communicate this fact to Mr. Shahini. At the outset, Mr. Shahini was also led to believe by Derek Galanis and others that Jason Galanis had substantial personal assets which he had invested in Gerova. It is worth recalling that, at this point, Mr. Shahini did not have any sense of Jason's past at this point. On the contrary, Jason appeared to be extremely successful and extremely wealthy. Mr. Shahini was also told, at the outset, that two lawyers (Jared Galanis and Barry Feiner) would oversee legal aspects of the project and that a highly respected

-4-

**YMER SHAHINI'S SENTENCING MEMORANDUM**

financial professional named Mark MacMillan would ensure that industry practices were observed. This veneer of legality played a role in Mr. Shahini's initial impressions.

Perhaps Mr. Shahini should have appreciated the scheme from the outset, but numerous factors made him vulnerable to manipulation by the Galanises and explain his difficulty in initially appreciating the truth. Mr. Shahini is not an investment professional or lawyer and had no experience to draw upon apart from developing systems and software. Mr. Shahini was not part of the Galanis family and that made him vulnerable being made to feel as though he were a son to them (particularly given his cultural views of friendship and family). Further, the active role of the lawyers and of Mark MacMillan, together with Derek's assurances, gave Mr. Shahini the impression, *in the beginning*, that Gerova was legitimate and that Jason had a real plan for success. John and Jason Galanis, moreover, forged Mr. Shahini's signature on documents, concealed account activity from Mr. Shahini, and even set up a false email account in his name (just as John Galanis did to his own son, Jared, with email and cell accounts). Over time, Mr. Shahini began to understand that the purpose of Gerova was not legitimate despite the continuous assurances of his friend Derek and the active role of two lawyers and of Mr. MacMillan in the business. Derek continued to mislead Mr. Shahini until the very end leading him to believe at first that Jason had tax issues which required concealing the transactions and later that John had stolen from Jason. Derek never revealed that the pump-and-dump scheme aspects of the scheme.[3]

In this connection, it is worth noting that the Galanises secured full control of all Gerova accounts very early in the scheme (for example, e-statements did not go to Mr. Shahini). In this way, Mr. Shahini

---

[3] Similarly, Mr. Shahini had no way of seeing the timed buying and selling and had no idea of this aspect of the scheme. This lack of information was unique to Mr. Shahini in the scheme.

*(Footnote continued)*

-5-

**YMER SHAHINI'S SENTENCING MEMORANDUM**

was kept in the dark regarding the movement of funds.[4] This is reflected in the fact that, unlike every other individual involved, Mr. Shahini profited very little from this scheme.

The fact that Mr. Shahini was kept in the dark regarding the coordinated buying and selling aspect of the scheme is related to Mr. Shahini's understanding of the legal and illegal aspects of the scheme. When the wheels started coming off, Mr. Shahini did not at first understand the scope of damage done. Derek Galanis told Mr. Shahini that the real issues were tax issues (which is of course not a defense for Mr. Shahini) and that he was liable for a massive loan ($13.8 million) which was taken and disbursed under Mr. Shahini's name and without his knowledge.

E.  Mr. Shahini's Profit

Mr. Shahini received approximately $310,000 through his accounts and has agreed to forfeit this amount (though he does not have any substantial assets as a result of having lost employment after the indictment). He advises, however, that approximately $110,000 "passed through" at the direction of others including a July 12, 2010 wire to Feiner $77,400 and cash to Derek Galanis on three occasions: 5,000 Euros (July 12, 2010), 10,000 Euros (June 22, 2010), and 15,000 Euros (October 29, 2010). Mr. Shahini is essentially broke and unemployable at this point in his life.

F.  Mr. Shahini's Loss of Employment and Movement and subsequent Detention in Kosovo

Mr. Shahini lived essentially under a kind of house arrest from September 2015 through June 2019. During that time, Mr. Shahini was unable to work or travel given the charges brought in this case. He lost his employment shortly after indictment and has essentially dedicated the last four years of his life

---

[4] Mr. Shahini signed POAs for Jared Galanis and Barry Feiner as attorneys who, he was initially told, would oversee compliance for Gerova. Mark MacMillan also had control over "Shahini" accounts. It Appears that Jason Galanis authorized MacMillan to control these accounts. Jared Galanis and Barry Feiner appeared to have controlled transfers through their trust accounts or "e-access."

*(Footnote continued)*

-6-

**YMER SHAHINI'S SENTENCING MEMORANDUM**

to taking care of his ailing parents and his children.[5] He has depleted his life savings and has no viable prospects for employment considering the impact of the indictment and now conviction.

After his detention in this case in Kosovo on June 11, 2019, Mr. Shahini was placed in solitary confinement in a maximum-security facility. He was held in that facility – used for terrorists – from June 11 to August 23, 2019. The attached letter from his counsel in Kosovo, attached as Exhibit O documents the conditions in which he was held.

### III.   MR. SHAHINI REQUESTS A VARIANCE TO 150 DAYS

**A.  Mr. Shahini's History and Characteristics (Section 3553(a)(1))**

Mr. Shahini should be sentenced to 150 days from June 11 (the date of his detention in Kosovo) based on his role in rescuing his extended family from the genocide in Kosovo; his role in taking care of his elderly parents and, in particular, his mother;[6] the personal cost he has already suffered including his estrangement from his children, his wife, and parents during his incarceration in a foreign country which his wife, children and parents are unable to visit for financial and health-related reasons; his loss of employment and movement for more than four years after indictment and before extradition; his incarceration in solitary confinement in Kosovo; and his waiver of litigation of extradition issues.

*/ / /*

---

[5] Mr. Shahini's typical day during this period consisted of taking care of his parents' needs including shopping and cooking for them, administering medications, and taking care of their home.
[6] Mr. Shahini's parents are in extremely bad health and, unfortunately, his mother has various issues, including severe heart disease, very high blood pressure, and progressive dementia. This combination of issues suggests that she may not have long to live and even less time to be able to relate to her son as her son. Mr. Shahini is paying a very high emotional price not being able to see his parents given their state of health. See Exhibit P which is a translation of his mother's medical record.

-7-

**YMER SHAHINI'S SENTENCING MEMORANDUM**

**B. A Sentence of No More Than 150 Days Is Sufficient Under Section 3553(a)(6).**

Under 18 U.S.C. § 3553(a)(6), an important factor in sentencing is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See, Booker, supra*, at 259-60. In this case, Mr. Shahini's sentence should be proportionate to the sentence imposed on one of the attorneys, Jared Galanis, who often directed Mr. Shahini as a member of the Bar. This Court should impose the same sentence, or lower, on Mr. Shahini in order to avoid the potential for a profoundly unwarranted and unjust disparity given the profound differences in culpability between Mr. Shahini and a member of the Bar who (1) abused his place of trust by virtue of his profession, (2) possessed specialized knowledge of securities law and trading, (3) profited financially much more than Mr. Shahini, and (4) frequently directed Mr. Shahini's conduct while acting as counsel for Gerova. Mr. Shahini, in contrast, did not profit substantially, was an outsider to the Galanis clan and to the world of securities, and received direction from Jared Galanis and Barry Feiner.

**C. General Purposes of The Criminal Justice System**

Under Section 3553(a)(2), this Court should consider the four general purposes of the criminal justice system: (1) just punishment (reflecting the seriousness of the offense); (2) general deterrence, to discourage others from committing the same acts; (3) specific deterrence, to discourage the defendant from committing the same acts; and (4) rehabilitation. *See generally* 18 U.S.C. § 3553(a)(2)(A)-(D).

**1. Just Punishment**

Mr. Shahini was pulled into a scheme that he did not understand fully at the outset. He was, at various times, deceived, manipulated, and lied to and always directed by others including lawyers and

-8-

**YMER SHAHINI'S SENTENCING MEMORANDUM**

professionals (Feiner and MacMillan) who have never been prosecuted. These facts do not absolve him, but they suggest that a just punishment falls far below the guideline range.[7]

### 2. General Deterrence

The *Adelson* court reasoned that in financial fraud cases, retribution and deterrence may be effectively achieved through minimal prison time and through the imposition of financial burdens. *Adelson, supra*, at 514. (*Citing*, Richard Frase, *Punishment Purposes*, 58 Stanford L. Rev. 67, 80 (2005) ("White-collar and regulatory offenders are more likely to be deterred, even by selective enforcement and modest penalties; such offenders have many lawful alternatives and much to lose from being convicted, regardless of the penalty.")

### 3. Specific Deterrence

There is no need to protect the public from Mr. Shahini given that he will be deported and that this offense represents an aberration in an otherwise exemplary life which would not have occurred absent had he not happened to have met Derek Galanis.[8]

### 4. Rehabilitation

Mr. Shahini has fully accepted responsibility for his role in the crimes at issue.

### IV.   CREDIT FOR TIME IN CUSTODY IN KOSOVO

18 U.S.C. § 3584(b)(1) states that "[a] defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence

---

[7] In *Adelson*, the government proffered a life sentence based on defendant's five count conviction, which included securities fraud and conspiracy counts, and the alleged loss of $260 million, but the judge found that a below-guideline sentence of three-and-a-half years constituted a just sentence based on the statutory factors set forth in Section 3553(a). *Adelson*, *supra*, at 509.

[8] As noted in *Adelson*, "there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *See, Adelson*, *supra*, at 514.

-9-

**YMER SHAHINI'S SENTENCING MEMORANDUM**

commences as a result of the offense for which the sentence was imposed that has not been credited against another sentence." Mr. Shahini was held in custody in a maximum-security prison in Kosovo from June 11 to August 23, 2019 (73 days). He should receive credit for this time which resulted from this offense and has not been credited against another sentence.

## V.     Restitution

Mr. Shahini does not yet have the Final PSR and therefore does not yet know the restitution amount recommended therein. He admits that restitution is an aspect of the sentence but submits that restitution should not be ordered in respect to a loss which would have occurred regardless of the defendant's conduct. *United States v. Marino*, 654 F.3d 310, 319 (2d Cir.2011).

## VI.     CONCLUSION

Mr. Shahini unknowingly joined a conspiracy and, to his great regret, elected to remain in the conspiracy once he realized the nature of the enterprise. During this time, he acted at the direction of numerous individuals at the lowest rung of the hierarchy in every sense. Compared to other members of the conspiracy, he possessed the least knowledge of the parameters and mechanisms of the fraud and no specialized skills necessary or useful for the fraud. Above him in this hierarchy – and directing him – was Jared Galanis. Undersigned counsel submits respectfully that this Court should not sentence Mr. Shahini to more time in custody than the time in custody imposed on Jared Galanis.

Dated:   November 19, 2019.                              Respectfully Submitted,


                                                         ___/s/_____
                                                         MARTÍN SABELLI